Bruce Larson and Peer Larson, his minor son,
Plaintiffs-Appellants,†

v.

Elizabeth Burmaster, Superintendent, Wisconsin
Department of Public Instruction, Karen Petric,
Superintendent, Whitnall School District,
Joel Eul, Principal, Whitnall High School,
Nancy Sarnow, Chairman, Math Department,
Whitnall High School and Aaron Bieniek,
Math Instructor, Whitnall High School,
Defendants-Respondents.

Court of Appeals

*No. 2005AP1433. Submitted on briefs May 1, 2006.
—Decided June 27, 2006.*

2006 WI App 142

(Also reported in 720 N.W.2d 134.)

333

335

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Bruce Larson*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Jeffrey A. Schmeckpeper* and *Dustin T. Woehl* of *Kasdorf, Lewis & Swietlik, S.C.*, of Milwaukee.

Before Fine, Curley and Kessler, JJ.

¶ 1. CURLEY, J. Bruce Larson, and his minor son, Peer Larson, appeal *pro se* from the order dismissing their action against Aaron Bieniek, Mathematics Instructor at Whitnall High School; Joel Eul, Principal of Whitnall High School; Nancy Sarnow, Chair of the Mathematics Department at Whitnall High School; and Karen Petric, Superintendent of the Whitnall School District (collectively, the District). The Larsons brought a suit claiming that Peer could not be required by Bieniek to complete summer homework. The trial court dismissed the case for failure to state a claim upon which relief could be granted, concluding that under WIS. STAT. §§ 118.001, 120.12(14) and 120.13 (2003–04),[1] it was within the school district's, and therefore Bieniek's, authority to require summer homework. On appeal, the Larsons contend that: (1) Bieniek was acting beyond his authority in assigning summer homework; (2) WIS. STAT. §§ 118.001 and 120.13 are unconstitutionally overbroad and WIS. STAT. § 120.12(14) is unconstitutionally vague; and (3) summer homework violates parents' constitutional right to

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

339

direct the education and upbringing of their children. The District argues that the Larsons' appeal is frivolous and move for costs.

¶ 2. We conclude that Bieniek had the authority to assign summer homework, that Wis. Stat. §§ 118.001, 120.12(14) and 120.13 are not unconstitutional, and that summer homework does not infringe on parents' right to direct the education and upbringing of their children, and accordingly affirm the trial court's dismissal of the case. We further conclude that the appeal is frivolous, and remand the matter to the trial court for a determination of reasonable costs and attorney fees.

## I. BACKGROUND.

¶ 3. In the spring of 2004, Peer, a student at Whitnall High School, included a class in pre-calculus, taught by Bieniek, in his schedule for the following fall.[2] The course was part of the honors sequence in mathematics, for which a student receives extra grade points toward his or her grade point average. During the last week of the spring semester, Bieniek came into the mathematics class Peer was enrolled in at the time and handed out to the students signed up for his pre-calculus class three assignments to be completed and submitted for grading during the summer. The assignments were lengthy pre-calculus problems that took a significant amount of time to complete. Late submis-

---

[2] These are the facts as alleged by the Larsons. Because this case is a review of the trial court's order dismissing the case, we accept as true all facts alleged by the Larsons, and all reasonable inferences that may be drawn from such facts, but we are not required to assume as true the legal conclusions pled by the Larsons. *See State v. Wisconsin Tel. Co.*, 91 Wis. 2d 702, 720, 284 N.W.2d 41 (1979).

sions were penalized by a reduction in the grade. The grades for the summer assignments were to be included in the final grade for the course at the end of the fall semester.

¶ 4. During the summer, Peer worked as a counselor at a Cub Scout camp for six weeks. He had arranged this job prior to being informed that he would have summer homework. Peer's job as a camp counselor left him only the Sunday of each week free and made him unable to complete his assignments by their due dates. The assignments caused Peer "a fair degree of distress." He ultimately submitted the assignments late and received a reduced grade.

¶ 5. After the commencement of the fall semester, Bruce found out about his son's summer homework and complained about it to the school district and the Wisconsin Department of Public Education. The Larsons were informed that summer homework is an ongoing practice in advanced placement mathematics classes taught by Department Chair Sarnow and to a lesser degree in other departments. Associate Superintendent for Curriculum and Instruction, Sally Habanek, explained to the Larsons in a letter dated September 20, 2004, that the decision of whether to assign summer homework is left up to the individual teachers. In a letter dated October 19, 2004, Habanek further explained that the Department of Public Education had offered "to work with any parent and student who feel that for one reason or another the requirements cannot be met within the summer time frame so that no student is penalized." On November 12, 2004, Bruce sent a letter to the District and Superintendent of the Wisconsin Department of Public Education, Elizabeth Burmaster, demanding: that the inclusion of Peer's grade for the summer assignments in the final

grade be left to his discretion; that future summer assignments, and their inclusion in the final grade, be voluntary; and that such policies be implemented districtwide and statewide. Burmaster responded via a letter dated December 6, 2004, explaining that these are "local school district issue[s]," and that the Department of Public Instruction does not have the authority to "grant to an individual student decision-making rights as to how performance on individual assignments are factored into a final grade" or "require districts to enact certain policies or practices unless such polices/practices are required by law." The letter also noted that:

> State law defines school terms as "the time commencing with the first school day and ending with the last school day that the schools of a school district are in operation *for attendance* (emphasis added) of pupils in a school year, other than for the operation of summer classes." Hence, the school term defines the start and end points of when students must be at or attend school. The law is silent on matters regarding school-related activities, such as the completion of assignments.

¶ 6. On January 10, 2005, the Larsons filed suit *pro se* against the District and Burmaster. Their complaint, which was largely a verbatim recitation of Bruce's November 12, 2004 letter, again demanded that: the inclusion of Peer's summer homework grade in the final grade be left to his discretion; summer assignments be voluntary and their inclusion in the grade be left to the student's discretion; and such policies be implemented districtwide and statewide. The complaint did not cite any authority, but seemed to argue that: (1) it was beyond the District's and the State's authority to issue summer homework because, after the end of the spring semester, students are not

342

enrolled in school until they register for fall; (2) during the summer, parents have a constitutional right to reclaim full authority over their children, including being free of homework; and (3) summer homework is poor public policy.

¶ 7. On January 27, 2005, Burmaster filed a motion to dismiss, arguing that the Larsons' complaint failed to state a claim upon which relief could be granted because it sought to compel her to perform a discretionary act she had no authority to perform, and consequently, she is entitled to reasonable attorney fees because the Larsons should have known that their complaint failed to state a claim. On February 16, 2005, the District filed a motion to dismiss, arguing that the Larsons' complaint failed to state a claim upon which relief could be granted because the school board has the discretion to determine the course of study at Whitnall High School and this authority is not limited to the school term. The Larsons filed responses to both motions, and amended their complaint. Their amended complaint argued in essence that: (1) the Whitnall School District is barred from assigning summer homework because, under the Wisconsin Compulsory School Attendance Law, WIS. STAT. § 118.045, the school term begins on September 1, so at the end of the spring term, the Larsons had met that requirement; (2) it was unfair to give Peer a lower grade because he was unaware of the assignments when he agreed to serve as camp counselor; and (3) summer homework is unconstitutional because: no law exists that explicitly authorizes summer homework; it violates the Due Process Clause of the Fourteenth Amendment; and it constitutes an unreasonable search and seizure under the Fourth Amendment.

¶ 8. On March 7, 2005, the trial court conducted a hearing on the motions, granting the District's and Burmaster's motions to dismiss. In a written order, the court first noted that its decision would not reach the heart of the debate—whether mandatory summer homework as part of an advanced class is a good thing—rather, the court defined the issue as: "Was Whitnall School District out of bounds when one of its math teachers interrupted Mr. Larson's summer vacation to require him to perform three honors pre-calculus homework assignments that would count against his fall grade?"

¶ 9. The court first analyzed the Larsons' argument that WIS. STAT. § 118.045, which provides "no public school may commence the school term until September 1," bars public schools from requiring summer homework. The court reasoned:

> But the line drawn by section 118.045 says nothing about homework; it mentioned only the date by which the "school term" may commence. The words "school term" have a specific meaning defined by state statute, WIS. STAT. § 115.001(12): "School term" means the time "commencing with the first school day and ending with the last school day that the schools of a school district are in operation *for attendance of pupils* in a school year, other than for the operation of summer school classes" (emphasis added). Thus, the reference to "school term" in section 118.045 is a limit only on the days on which schools are open for attendance. Because Peer Larson's math teacher did not require him to attend during the summer – in other words, to be present at school – section 118.045 is not a limit on the assignment of homework.

¶ 10. The court explained that WIS. STAT. §§ 120.12(14) and 120.13 define the duties and powers of the Whitnall School Board: "The school board, as

344

the boss of Peer Larson's math teacher, is given broad powers by the legislature to 'do all things reasonable to promote the cause of education,' WIS. STAT. § 120.13, and to '[d]etermine the school course of study.' WIS. STAT. § 120.12(14)." Noting that WIS. STAT. § 118.001 calls for a broad interpretation of those statutory duties and powers, the court concluded that:

> I believe these laws set some pretty wide boundaries within which school boards and those that work for them, like Peer Larson's math teacher, can operate and determine how kids should be taught, and therefore I believe that, whether summer homework is a good idea or not, the Whitnall School District is well within its authority to require summer homework of Peer Larson, and make the satisfactory completion of it an element of his grade. The Larsons are unable to cite any federal or state law that expressly prohibits the giving of homework over summer vacation.

¶ 11. The court rejected what it termed "a variation of the equitable notion of estoppel": that Peer could be docked points for failing to do the homework because it was not assigned until after he had accepted a summer job. The court noted that not only do "[t]he Larsons offer no law . . . that suggests that a student is generally entitled to invoke estoppel against his or her teachers," but also,

> [T]here is no allegation that the district made any promise to Peer Larson about his summer vacation that entitled him to assume he would have no homework, or any representation about the pre-calculus course or about homework generally that entitled him to assume that homework would not be counted if he lined up a summer job before it was assigned.

345

¶ 12. The trial court also rejected the Larsons' claim that assigning summer homework violated the Due Process Clause, stating:

> [T]he Supreme Court has not extended substantive Due Process protection to summer vacation, and the Larsons offer no reason why a student's enjoyment of summer vacation . . . especially in the case of a student who has volunteered for a course that is not compulsory, but for which he or she hopes to earn additional credit – should rank within the pantheon of family matters that are so fundamental to family life as to have earned constitutional protection.

¶ 13. The court likewise rejected the claim that summer homework violates the Fourth Amendment ban on unreasonable searches and seizures, because "summer homework involves neither an invasion of some private space nor some seizure of some tangible object."

¶ 14. The court addressed the Larsons' claim that "because no law has been enacted specifically authorizing summer homework, then summer homework is unconstitutional." Once again, the trial court was not convinced:

> Had the Larsons done a bit more homework, they would have discovered that the people of our state granted to the Legislature in Article X, section 1 of the state constitution the power to establish school boards and the state superintendent and to confer upon them the powers and duties the Legislature saw fit. WIS. STAT. §§ 120.12 and 120.13, cited above, which broadly authorize a math teacher to prescribe homework over the summer to help kids learn pre-calculus, fit comfortably within this constitutional grant of power to the government.

¶ 15. Finally, the trial court also rejected what it saw as an attempt to seek a writ of mandamus, ordering school officials not to make summer homework mandatory. The court explained that not only do "the Larsons . . . point to no clear and unequivocal prohibition on teachers giving summer homework," but also "it would be an abuse of the discretion conferred upon me to compel some action by the superintendent of the school district through mandamus when no clear and unequivocal duty has been identified and when their powers and duties regarding matters such as homework involve the exercise of discretion."

¶ 16. Burmaster moved for an order finding that the claim was frivolous and awarding costs. The District did not join in the motion, but reserved the right to do so if the Larsons continued to pursue the claim. The trial court issued a lengthy written order comprehensively explaining why the Larsons' claims against Burmaster were frivolous, specifically informing the Larsons that they had misunderstood what they needed to turn up in their investigation of the law before they could proceed to court, and that their theories were "half-baked."[3] Burmaster subsequently withdrew the motion for costs and fees. Although the trial court warned the Larsons that they would face difficulties making coherent constitutional arguments without the help of a lawyer on appeal, the Larsons appeal *pro se* the dismissal of their suit against the District.

---

[3] The court explained that it could not award Burmaster the attorney fees she had requested because the fees had not been adequately justified or itemized in sufficient detail. The court concluded that Burmaster could resubmit an affidavit supporting the claim for attorney fees.

## II. ANALYSIS.

■

¶ 17. Our review of the trial court's dismissal of a complaint for failure to state a claim is *de novo*. *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶ 19, 284 Wis. 2d 307, 700 N.W.2d 180. A motion to dismiss for failure to state a claim upon which relief can be granted "tests the legal sufficiency of the complaint." *Id.* (citation omitted). We accept as true all facts pleaded and reasonable inferences that may be drawn from such facts. *State v. Wisconsin Tel. Co.*, 91 Wis. 2d 702, 721, 284 N.W.2d 41 (1979). However, "legal inferences and unreasonable inferences need not be accepted as true." *Beloit Liquidating Trust v. Grade*, 2004 WI 39, ¶ 17, 270 Wis. 2d 356, 677 N.W.2d 298. "A complaint should not be dismissed as legally insufficient unless it appears certain that a plaintiff cannot recover under any circumstances." *Id.*

¶ 18. On appeal, the Larsons contend that: (1) Bieniek was acting beyond his authority in assigning summer homework; (2) WIS. STAT. §§ 118.001 and 120.13 are unconstitutionally overbroad and WIS. STAT. § 120.12(14) is unconstitutionally vague;[4] and (3) sum

---

[4] The District maintains that because the Larsons did not raise Bieniek's alleged lack of authority to assign summer homework and the constitutionality of WIS. STAT. §§ 118.001, 120.12(14), and 120.13 at the trial court, the Larsons are precluded from raising them on appeal. We agree that the argument regarding Bieniek's authority was modified from the Larsons' original argument, and that the constitutionality of §§ 118.001, 120.12(14) and 120.13 are new arguments. We further agree that the Larsons would generally be precluded from raising them. *See, e.g., State v. Caban*, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) (reviewing court will not consider argument raised for first time on appeal or review). We choose

mer homework violates parents' right to direct the education and upbringing of their children.[5] The Dis-

to exercise our discretion, *Fuerst v. Fuerst*, 93 Wis. 2d 121, 130, 286 N.W.2d 861 (Ct. App. 1979) ("[A] reviewing court may, in exercise of its discretion and in the proper case, consider new issues raised for the first time on appeal."), and address these arguments in the interest of informing future litigants why the Larsons' arguments are without arguable merit and deterring future litigation of these issues. Thus, even if these arguments had been timely raised before the trial court, this would not have influenced our ultimate conclusion in Section D of this opinion that the Larsons' appeal is frivolous. Our choice to address these issues should therefore not be interpreted as giving validity to the Larsons' arguments.

[5] The Larsons also argue: "the trial court failed to identify and apply an established standard of review in deciding that the infringement of the Larson's right to direct the education of his child, posed by the summer homework assignments previously described, did not rise to the level of rights protected by the Due Process Clause of the Fourteenth Amendment." The Larsons repeat this argument in their Reply brief: "As we argued on p. 20 of the Appellants' Brief, the trial court applied *no* standard of review to claims of our constitutional rights being infringed upon" (italics by the Larsons).

It appears as though the Larsons do not understand the meaning of "standard of review." "A standard of review is 'a limiting mechanism which defines an appellate court's scope of review,' and hence its power . . . . [S]tandards of review are measures of the degree of deference that appellate courts must pay to lower tribunals, most notably trial courts." *Peplinski v. Fobe's Roofing, Inc.*, 193 Wis. 2d 6, 13 n.1, 531 N.W.2d 597 (1995) (citation omitted).

Even disregarding the Larsons' incorrect terminology, the fact that a seven-page section of their brief entitled "a judicial standard of review *is* required" does not discuss standard of review, and giving the Larsons, as *pro se* litigants, some leniency, *Waushara County v. Graf*, 166 Wis. 2d 442, 452, 480 N.W.2d 16 (1992) ("While some leniency may be allowed, neither a trial court nor a reviewing court has a duty to walk *pro se*

trict argues that the Larsons' appeal is frivolous and moves for costs.[6] We examine each in turn.

### A. Teachers' Authority to Assign Summer Homework

¶ 19. The Larsons contend that Bieniek was acting beyond his authority in assigning summer homework because the duties and powers of WIS. STAT. § 118.001, 120.12(14), and 120.13 are inapplicable to him.[7] The Larsons concede that these statutes afford the school board the powers enumerated in them: "He

litigants through the procedural requirements or to point them to the proper substantive law."), this portion of their brief still does not lend itself to review by this court. This section contains a series of constitutional references, highlighting differences between the Wisconsin and Federal Constitutions, specifically emphasizing that at times the Wisconsin Constitution offers greater protection than the Federal Constitution. Unfortunately, this discussion is not accompanied by an explanation of the purported relevance of any of the constitutional references to the facts of this case. It is impossible for us to address it. *See Rizzuto v. Cincinnati Ins. Co.*, 2003 WI App 59, ¶ 24, 261 Wis. 2d 581, 659 N.W.2d 476 (this court does not decide issues that are not sufficiently developed).

[6] The District addresses what the trial court referred to as a mandamus issue, arguing that the Larsons have failed to make a showing of mandamus. The relief the Larsons seek—that Peer be allowed to decide whether to include the summer grade in the final grade, that all summer homework be voluntary and that these policies be implemented state and districtwide—could be granted only by means of a writ of mandamus. The Larsons do not address the issue. Because none of the Larsons' arguments are successful, we need not further consider the relief the Larsons seek.

[7] The Larsons argue both that Bieniek did not have the authority to assign homework "for next semester classes to students not yet enrolled in his class," and that Bieniek did not

was acting on his own initiative and without authority given to school boards by Wis. SS 118.001, 120.12(14), and 120.13." They maintain, however, that "While these statutes may authorize a broad range of school board actions, I suggest that they do not authorize the actions of individual instructors acting on their own initiative as previously noted." The heart of the Larsons' argument thus seems to be that while 118.001, 120.12(14), and 120.13 grant the school board broad powers that may be used to authorize summer homework, "without an official act of the school board" those same powers are not transferred to the individual instructors. As a result, their argument goes, the statutes are inapplicable to Bieniek and he was therefore acting beyond his authority in assigning summer homework. We disagree.

¶ 20. Whether Bieniek had the authority, pursuant to Wis. Stat. § 118.001, 120.12(14) and 120.13, to issue summer homework requires statutory interpretation, which is a question of law that we review *de novo*. *See State v. Stenklyft*, 2005 WI 71, ¶ 7, 281 Wis. 2d 484, 697 N.W.2d 769.

¶ 21. The three statutes in question are: Wis. Stat. § 120.13, which reads: "The school board of a common or union high school district may do all things reasonable to promote the cause of education, including establishing, providing and improving school district programs, functions and activities for the benefit of

have the authority to issue "summer vacation homework assignments." Because both arguments involve the same assignments, are based on the authority under Wis. Stat. §§ 118.001, 120.12(14) and 120.13 not extending to Bieniek, and are phrased almost identically by the Larsons, the two arguments are essentially the same. We therefore treat them as one argument.

351

pupils . . ."; WIS. STAT. § 118.001, which reads: "The statutory duties and powers of school boards shall be broadly construed to authorize any school board action that is within the comprehensive meaning of the terms of the duties and powers, if the action is not prohibited by the laws of the federal government or of this state."; and WIS. STAT. § 120.12(14), which reads: "The school board of a common or union high school district shall: Determine the school course of study."

¶ 22. The Larsons do not provide any citations to legal authority for why the duties and powers of WIS. STAT. § 118.001, 120.12(14) and 120.13 extend to school boards but do not extend to the individual instructors. In fact, the Larsons' only reason for why the duties and power of these statutes allegedly do not extend to teachers is the single sentence: "While these statutes may authorize a broad range of school board actions, I suggest that they do not authorize the actions of individual instructors acting on their own initiative . . . ." Instead, they point to other reasons for why they feel Bieniek lacked the authority to assign summer homework.[8] Unfortunately, these claims are little more

[8] The Larsons maintain that: nothing in the record suggests that Sarnow, Eul or Petric supported Bieniek's decision to issue summer homework; there is no Whitnall School Board policy on summer homework; "the legal basis for the school/teacher student relationship created with student enrollment is dissolved at the close of the school term"; the Larsons had a "reasonable expectation" of being free from homework because "[s]ummer homework is the exception to the rule" and therefore the Larsons "were due notice of any such requirement in a timely manner, certainly before the last week of school"; "students and their families have a right to expect reasonableness and fairness in their dealings with the schools, including the right to plan their activities for the summer"; the "assignments may have been unconscionable in their unfairness (pe-

than conclusory allegations, unsupported by authority, about why the Larsons view Peer's summer homework as unfair, unreasonable or unconscionable. While Peer may have been surprised to find out the last week of classes that he would have summer homework, none of their claims, even if they were true, support the crux of the Larsons' argument: that WIS. STAT. § 118.001, 120.12(14) and 120.13 do not apply to Bieniek.

¶ 23. To the contrary, we are convinced that the duties and powers of WIS. STAT. § 118.001, 120.12(14) and 120.13 do extend to the individual teachers as employees of the school board. We see no logic in the

---

nalizing students for taking a more challenging course) and in their unreasonableness (throwing a last minute monkey wrench into student and family plans for the summer)"; Peer's guidance counselors never mentioned summer homework; and the Whitnall student curriculum guide does not discuss summer homework.

Curiously, these claims are contradicted by the Larsons' own complaint and amended complaint. Their complaint acknowledges that Sarnow had an ongoing practice of assigning summer homework and that other departments followed this same practice to a lesser degree. Their amended complaint references a letter from Habanek explaining that the district permits the individual teachers to determine whether to assign summer homework, and acknowledged that the District offered to work with students who had difficulties complying with the summer homework requirement. These facts call into question the claims that Bieniek was acting on his own and that his actions were unsupported by Sasnow, Eul, and Petric, particularly since Sasnow is herself an avid user of summer homework. The notion that teachers are allowed to independently decide whether to use summer homework contradicts the idea that there is no Whitnall School Board policy in place. The District's offer to work with students to avoid penalties shows a flexible approach and hardly implies "a last minute monkey wrench."

353

Larsons' suggestion that in order for the duties and powers of 118.001, 120.12(14) and 120.13 to extend to the individual teachers an "official act of the school board" is required. We are confident that when the legislature used the words "do all things reasonable to promote the cause of education," 120.13, and "determine the school course of study," 120.12(14), especially in conjunction with 118.001, which directs us to construe these duties and powers broadly, the legislature did not intend for the school board to perform an "official act" in order for those duties and powers to be transferred to the employees of the school board. Had the legislature intended this to be the case, it certainly could have so stated. It did not. It would be absurd to require teachers, the individuals actually responsible for the instruction and often the only employees of the school board who actually have direct contact with the students, to obtain special permission from the school board with respect to every detail of their teaching. Summer homeworkparticularly for an honors class for which students receive additional creditfits comfortably within the range of what is reasonable.

### B. Constitutionality of WIS. STAT. §§ 118.001, 120.12 and 120.13

¶ 24. The Larsons contend that WIS. STAT. § 118.001, 120.12 and 120.13 are unconstitutional. We review the constitutionality of statutes *de novo,* without deference to the trial court. *State v. Bertrand,* 162 Wis. 2d 411, 415, 469 N.W.2d 873 (Ct. App. 1991). Statutes enjoy a presumption of constitutionality and we review them so as to preserve their constitutionality. *Id.* A party challenging the constitutionality of a statute

must demonstrate that it is unconstitutional beyond a reasonable doubt. *State v. Pittman*, 174 Wis. 2d 255, 276, 496 N.W.2d 74 (1993).

¶ 25. The Larsons claim that WIS. STAT. § 118.001 and 120.13 are unconstitutionally overbroad. They cite case law on overbreadth: "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate," *State v. Janssen*, 219 Wis. 2d 362, 374, 580 N.W.2d 260 (1998), and argue: "I suggest that Wis. SS 118.001 and 120.13's sweeping and all-encompassing empowerment meets the above criteria for being found void for overbreadth." In their reply brief, in response to the District's assertion that the Larsons had failed to adequately develop their argument, the Larsons remark:

> It appeared obvious to us, but apparently not to everyone, for which we apologize, that "sanctions" in this case refers to the broad powers that as interpreted by the lower court, have been granted to school boards by Wis. SS 118.001, 120.12(14), and 120.13 and "constitutionally protected conduct which the state is not permitted to regulate" refers to the constitutionally protected right of parents to manage, control and direct the upbringing and education of their children.

The Larsons are mistaken.

¶ 26. An overbreadth challenge to a statute invokes the protections of the First Amendment of the United States Constitution. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also State v. Stevenson*, 2000 WI 71, ¶¶ 11–18, 236 Wis. 2d 86, 613 N.W.2d 90.

355

"A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." *Janssen*, 219 Wis. 2d at 374 (citation omitted). The overbreadth doctrine is grounded in the right to substantive due process and "has the effect of preventing the limiting, by indirection, of constitutional rights." *State v. Tronca*, 84 Wis. 2d 68, 89, 267 N.W.2d 216 (1978).

¶ 27. Not only do the Larsons fail to cite any case law or make a reasoned argument as to *why* these statutes might be overbroad, their error is more profound than that. Because a statute can be unconstitutionally overbroad only if it regulates "constitutionally protected conduct," *see Janssen*, 219 Wis. 2d at 374, and WIS. STAT. § 120.13 and 118.001 do not regulate conduct, rather they set forth the duties and powers of the school board, and instruct broad application of those duties and powers, respectively, the overbreadth doctrine cannot apply. Moreoverdespite correctly citing the meaning of overbreadthwhat the Larsons fail to realize is that the overbreadth doctrine has no application outside the First Amendment context. *See Salerno*, 481 U.S. at 745; *see, e.g., Janssen*, 219 Wis. 2d 362 (statute prohibiting flag desecration by punishing any speech that was defiant or contemptuous of, or expressed distaste for the flag, was unconstitutionally overbroad); *Shea ex rel. Am. Reporter v. Reno*, 930 F. Supp. 916 (S.D.N.Y 1996) (section of the Communications Decency Act, which criminalized the use of computer services to display sexually explicit materials to minors, was unconstitutionally overbroad because it banned protected indecent communication between adults). Consequently, the Larsons' application of the overbreadth standard is fundamentally flawed. Contrary to their claim, "sanc-

tions" refers to penalties associated with the violation of the statute, not powers of the school board, and "constitutionally protected conduct" refers to conduct protected by the First Amendment that brings about the violation of the statute, not parents' right to direct the education and upbringing of children. Because the overbreadth doctrine does not apply, our analysis need not go further.

¶ 28. With respect to WIS. STAT. § 120.12(14), the Larsons argue that it is "void for vagueness." They state: "I argue that this statute is 'void for vagueness' following *Wisconsin v. Popanz,* 112 Wis. 2d 166, 332 N.W.2d 750, 756 (1983), in which the Wis. S. Ct. ruled that the state's compulsory school attendance law was 'void for vagueness' insofar as it failed to define private school." As support, they provide a series of hypothetical situations that they allege show that the wording of the statute could have different meanings. Once again, the Larsons are mistaken.[9]

¶ 29. The concept of vagueness is based on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. *State ex rel. Hennekens v. River Falls Police Fire Comm'n,* 124 Wis. 2d 413, 420, 369 N.W.2d 670 (1985). A vagueness challenge to a statute is subject to a two-prong test:

> The first prong of the vagueness test is concerned with whether the statute sufficiently warns persons

---

[9] They also add, citing the definition of ambiguity, that "[f]or the same shortcomings SS 120.12(14) may be void for ambiguity." A mere suggestion that a statute "may" be ambiguous is not an argument that this court can address. *See Rizzuto,* 261 Wis. 2d 581, ¶ 24.

"wishing to obey the law that [their] conduct comes near the proscribed area." The second prong is concerned with whether those who must enforce and apply the law may do so without creating or applying their own standards.

*Pittman*, 174 Wis. 2d at 276 (citations omitted; ellipsis and bracketing in *Pittman*). The concept of vagueness thus applies only to statutes that regulate conduct and requires that such a statute "give adequate notice of what is prohibited, so as not to delegate 'basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.' " *Dog Fed'n of Wis., Inc. v. City of S. Milwaukee*, 178 Wis. 2d 353, 359, 504 N.W.2d 375 (Ct. App 1993) (citation omitted). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Id.* at 359–60 (citation omitted).

¶ 30. The Larsons again fail to develop a reasoned argument for *why* Wis. Stat. § 120.12(14) ought to be declared unconstitutionally vague or how their reference to *Popanz* is relevant to this case. Their flaw is more fundamental, however, because the key to the vagueness doctrine is that a statute must be clear and definite enough if a person is to be penalized for engaging in *conduct* prohibited by the statute. *See, e.g., State v. Dennis H.*, 2002 WI 104, 255 Wis. 2d 359, 647 N.W.2d 851 (standard of "dangerousness" in civil commitment statute was not unconstitutionally vague because it did not allow involuntary commitment upon a finding of mental illness alone, and contained an ascertainable standard of commitment); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997)

(school district regulation prohibiting gang symbols was unconstitutionally vague because it failed to provide adequate notice regarding unacceptable conduct and failed to offer clear guidance for those applying it). Section 120.12(14) does not regulate conduct or subject violators to penalties, but instead sets forth the powers of the school board, and hence cannot be unconstitutionally vague. Because the vagueness doctrine does not apply to this case, we need not analyze it further.[10]

## C. Constitutional Right to Homework-Free Summers

¶ 31. The Larsons next contend that summer homework violates parents' fundamental right to direct and control the upbringing and education of their children under the Due Process Clause of the Fourteenth Amendment. As support, they cite a long line of Supreme Court cases on parents' right to direct their children's education and upbringing, including *Troxel v. Granville*, 530 U.S. 57 (2000), *Wisconsin v. Yoder*, 406 U.S. 205 (1972), *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), and *Meyer v. Nebraska*, 262 U.S. 390 (1923), and argue: "It appears certain from these decisions that a

---

[10] The Larsons also present an additional argument in the event that this court agrees with either of their first two arguments—that Bieniek acted beyond his authority in assigning summer homework, or that Wis. Stat. §§ 118.001, 120.13 and 120.12 are unconstitutional. They maintain that if either argument is successful, it follows that Bieniek, Sarnow, Eul, and Petric "knew or should have known" that assigning summer homework "was contrary to the Larsons' constitutional rights," and that, as a result, "each of them was re-miss in not taking steps to confirm the legal basis for the Larsons' complaint, and not taking steps to correct the complained of practices." Because the Larsons' first two arguments are unsuccessful, we do not address this argument.

parent or guardian has a fundamental right to use his children's summer vacation (that time left to them after complying with the State's Compulsory School Attendance law) to introduce educational activities and experiences that may or may not complement the school's curriculum, without suffering interference from lengthy homework assignments and midsummer deadlines."

¶ 32. The Larsons then list the "significant" losses they claim they suffered as a result of the summer homework: that the Larsons were "robbed" of ten percent of their summer vacation; that Peer suffered a reduced grade point average for missing "one or more of the vacation deadlines"; and that Peer faced a "dilemma" posed by the conflict between the assignments and his commitment to the Cub Scouts, which caused him "a fair amount of distress."[11] The Larsons also

---

[11] Recognizing that we are required to accept the facts pled by the Larsons as true, we note that the facts they present contain some curious inconsistencies. They claim that the three homework assignments caused Peer distress: "Because Peer's commitment to the Cub Scouts gave him just Sundays off to come home, and of that day he spent the hours from 8:50 AM to 12:10 PM attending church, leaving about six hours for Sunday dinner, rest, recreation, and re-packing before heading to camp; he was unable to complete the assignments and suffered a fair degree of distress because of it." They also allege that the three assignments "robbed" Peer of ten percent of his summer vacation, resulting in an "encroachment upon family vacation time and parental prerogatives as to how our children spend their summers." However, their brief also states that "Bruce Larson first learned of the size of the assignments, the summer deadlines, and grading of them, after school re-opened in the Fall." It thus appears as though the "distress" from which Peer allegedly suffered was not significant enough to have prompted him to mention the assignments, or their associated distress, to

make sweeping statements about lack of due process, fundamental rights, strict scrutiny and lack of a compelling interest, and while they do not actually apply these principles in the form of an argument, we will treat it as an argument that they have a liberty interest in a homework-free summer that amounts to a fundamental right subject to strict scrutiny.[12] We are not convinced.

¶ 33. The Fourteenth Amendment to the United States Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law . . .," U.S. CONST. amend. XIV, 1. The Supreme Court has long recognized that the liberties protected by the Due Process Clause of the Fourteenth Amendment include "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. In 1923, the Court held that the "liberty" protected by the

his father on any of six Sundays he was home from the six-week camp or at any other time during the summer, and in fact he does not appear to have done so until the fall, long after all due dates for the three assignments had passed. How Bruce can now complain that his son was "robbed" of ten percent of his summer vacation, resulting in an "encroachment upon family vacation time," when he admits being unaware of the existence of the assignments until the fall semester was already in session, is unclear. Absent from the Larson brief is likewise an explanation for why Peer submitted his assignments late and why he was docked points if he did in fact spend ten percent of his summer completing the assignments.

[12] The Larsons also include a lengthy discussion about the Ninth and Tenth Amendments of the United States Constitution, but do not explain how these amendments allegedly apply to the case at hand. Because this is not an argument developed to a point where it lends itself to analysis, we cannot address it. *See Rizzuto*, 261 Wis. 2d 581, ¶ 24.

Due Process Clause includes the right of parents to "establish a home and bring up children," and "to control the education of their own." *Meyer*, 262 U.S. at 399, 401. In *Meyer*, the Court concluded that the right included the right to provide education in the family's language, German. *Id.* at 400. Two years later, the Court reiterated that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534–35. The Court concluded that compulsory education could be satisfied by attending a private school, and struck down an Oregon law that required parents to send their children to a public school, rather than a Roman Catholic parochial school. *Id.* In so concluding, the Court in *Pierce* noted, however, that: "No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school . . . ." 268 U.S. at 537.

¶ 34. In *Yoder*, a case that involved both a Fourteenth Amendment claim based on a parent's right to direct the education and upbringing of children and a claim based on the Free Exercise of Religion Clause, the Supreme Court held that Wisconsin could not compel Amish children to attend school beyond age fourteen. 406 U.S. at 232–35. The Court cautioned that:

> [W]e must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to *reasonable* state regulation of education if it is based on purely secular considerations.

362

*Id.* at 215 (emphasis added). Emphasizing the unique importance of the Amish faith, the court further cautioned that their decision was intended to be narrow:

> [C]ourts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable education requirements. It cannot be overemphasized that we are not dealing with a way of life and mode of education by a group claiming to have recently discovered some 'progressive' or more enlightened process for rearing children for modern life.

*Id.* at 235.

¶ 35. While "[t]he Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education," *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005), it is clear that the right is neither absolute nor unqualified, *see Lehr v. Robertson*, 463 U.S. 248, 256 (1983) (constitutional protection available for parent-child relationship in "appropriate cases"); *see, e.g., Runyon v. McCrary*, 427 U.S. 160, 178 (1976) (no parental right to educate children in private segregated schools).

¶ 36. Although there is no Wisconsin case law directly on point, numerous federal circuit courts of appeal have held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment. *See, e.g., C.N.*, 430 F.3d 159 (no right to exempt child from survey that sought information about drug and alcohol use, sexual activity, physical violence, and suicide attempts); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) (no right to exempt child from survey about psychological barriers

that included questions on sexual topics); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001) (no right to exempt child from school uniform policy, even assuming that it regulated expressive conduct entitled to constitutional protection); *Hooks v. Clark County Sch. Dist.*, 228 F.3d 1036 (9th Cir. 2000); (no right to demand subsidized speech therapy services to home-schooled disabled child, provided to private or public schooled children); *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694 (10th Cir. 1998) (no right to send home-schooled child to public school "on a part-time basis, and to pick and choose which courses their children will take from the public school," in violation of policy against part-time attendance); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454 (2d Cir. 1996), *cert. denied*, 519 U.S. 813 (1996) (no right to exempt child from mandatory participation in community service program); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994) (no right to exempt child from certain reading programs parent finds objectionable).

¶ 37. Two cases in particular provide guidance. First, in *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995), *cert. denied*, 516 U.S. 1159 (1996), the First Circuit rejected the argument that parents' right to direct the education and upbringing of their children includes the right to exempt their children from a high school assembly presentation about AIDS that included explicit references to sexuality that the parents felt was morally reprehensible. *Id.* at 533. *Brown* provides an instructive comparison between that case and *Meyer* and *Pierce*.

> The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational programwhether it be religious instruction at a private school or instruction

364

in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education. *We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children.* We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me." The first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children. If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter.

*Brown*, 68 F.3d at 533–34 (citations omitted; emphasis added).

¶ 38. Second, in *Blau v. Fort Thomas Public School District*, 401 F.3d 381 (6th Cir. 2005) the Sixth Circuit recently concluded that a dress code that forbade blue jeans did not violate parents' right to direct the education and upbringing of children, *id.* at 396, and explained the parents' right to direct a child's education as follows:

While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracur-

ricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Id.* at 395–96 (citations omitted; emphasis by *Blau*).

¶ 39. Applying these principles, the Larsons' claim fails. As already noted, the Larsons cite a plethora of Supreme Court case law and make sweeping references to constitutional doctrines, but do not apply these concepts to their case in the form of a reasoned argument. Even disregarding the inadequate briefing, the Larsons' argument is clearly without merit. We agree with the Larsons that as Peer's parents, they have a constitutional right to direct his education, up to a point. As we have explained, parents do have a right to: send their child to private school, religious or secular, *Pierce*, 268 U.S. 510; have their child learn a foreign language, *Meyer*, 262 U.S. 390; and withdraw their child from public education where their religion requires it as part of a way of life, *Yoder*, 406 U.S. 205. Even though Wisconsin courts have not specifically addressed this issue, the extensive federal case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject.

¶ 40. The claimed constitutional right the Larsons wish to establish is the right of parents to have their children free of homework during the summer. The Larsons would have this right override the school board's policy to allow the individual teachers to decide whether to assign summer homework. The Larsons are in essence asking this court to tailor the Whitnall High

School curriculum to their liking, and asserting that parents, rather than the Legislature, should be deciding the course of study. As the District points out, the Larsons "want to take advantage of the advanced math class offered by the school," yet "set their own rules for the class by allowing Peer Larson, and every other student, to decide for themselves whether to do the homework, or not, and decide whether it should be counted in their grade, or not," giving the Larsons "the best of both worlds."

¶ 41. Homework-free summers simply do not come close to attending private school, learning a foreign language, or the Amish faith's prohibition of public schooling beyond age fourteen. The Larsons seek to establish as a fundamental right precisely what *Brown* and *Blau* explain is not a fundamental right. They are trying to "direct *how* a public school teaches their child," *Blau*, 401 F.3d at 395–96 (emphasis in *Blau*), and "dictate the curriculum at the public school to which they have chosen to send their child[]," *Brown*, 68 F.3d at 533–34. The Larsons' attempt to interfere with the state's and school district's regulation of education is nothing more than an attempt to impose their own personal preferences, based on precisely the type of "secular considerations" *Yoder* warned against. *See id.*, 406 U.S. at 215. The Larsons have not shown that parents' fundamental constitutional right to direct a child's education and upbringing includes homework-free summers.

¶ 42. If a fundamental constitutional right is violated, strict scrutiny is applied, *see Washington v. Glucksberg*, 521 U.S. 702, 728 (1997), and if no fundamental right is infringed, the challenged action need only "be shown to bear some rational relationship to

legitimate state purposes," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37–40 (1973). Because we hold that summer homework does not violate a fundamental right, strict scrutiny does not apply, and Bieniek's summer homework need only have a rational basis. A state action is presumed to have a rational basis, and it is the Larsons' burden to show otherwise. *See Milwaukee Brewers Baseball Club v. Wisconsin Dep't. of Health & Soc. Servs.*, 130 Wis. 2d 79, 98–99, 387 N.W.2d 254 (1986). They have not done so. As the Supreme Court noted in *Yoder,* "courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." 406 U.S. at 235. Decisions as to what the curriculum offers or requires are uniquely committed to the discretion of local school authorities, *see Goss v. Lopez*, 419 U.S. 565, 578 (1975), not that of parents and students. Here, the relevant duties and powers of the local school authorities are set out in Wis. Stat. § 118.001, 120.12(14), and 120.13.

## D. *Frivolous Appeal*

¶ 43. The District contends that the Larsons' appeal is frivolous and moves for costs under Wis. Stat. rule 809.25(3).

¶ 44. Following the dismissal of their case, the Larsons were on notice that the District would consider any further proceedings frivolous and would move for costs. *See Howell v. Denomie*, 2005 WI 81, ¶ 19, 282 Wis. 2d 130, 698 N.W.2d 621 (notice required to give opposing party opportunity to be heard). The Larsons' brief in chief did not address the issue of whether their appeal was frivolous. After the District, as it stated it would, moved for costs, the Larsons chose to file a reply. The Larsons' reply did not, however, respond to or

mention the District's argument that their appeal was frivolous. *See State v. Peterson*, 222 Wis. 2d 449, 459, 588 N.W.2d 84 (Ct. App. 1998) (unrefuted arguments are deemed admitted).

¶ 45. WISCONSIN STAT. RULE 809.25(3) authorizes the court to award costs and attorney fees upon determining that an appeal is frivolous. As relevant here, an appeal is frivolous if "[t]he party or the party's attorney knew, or should have known, that the appeal or cross-appeal was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." Sec. 809.25(3)(c)2. Whether an appeal is frivolous is a question of law. *Howell*, 282 Wis. 2d 130, ¶ 9. An appellate court considers "what a reasonable party or attorney knew or should have known under the same or similar circumstances." *Id.* "As with lawyers, a pro se litigant is required to make a reasonable investigation of the facts and the law before filing an appeal." *Holz v. Busy Bees Contracting Inc.*, 223 Wis. 2d 598, 608, 589 N.W.2d 633 (Ct. App. 1998) (emphasis added). If an appeal is found to be frivolous, "the court *shall* award to the successful party costs, fees, and reasonable attorney fees under this section." Sec. 809.25(3)(a) (emphasis added). "To award costs and attorney fees, an appellate court must conclude that the entire appeal is frivolous." *Howell*, 282 Wis. 2d 130, ¶ 9.

¶ 46. The District maintains that there is no good faith basis to argue, as the Larsons do, that they have a right to change education policy to their liking by making all summer homework voluntary and letting the students decide whether the assignments should count in their grade. The District submits that the fact

that the Larsons did not appeal the order finding their claims against Burmaster frivolous, but have instead adopted new arguments against the District, shows that the Larsons have not pursued this appeal in an effort to ensure compliance with the law or to modify existing law. Rather, the District contends, the Larsons have pursued this appeal solely in an attempt to obtain personal benefit, and without factual and legal support. We agree.

¶ 47. Even as *pro se* litigants, the Larsons should have known that no reasonable basis existed for a good faith argument for a modification of existing education policy in the manner in which they sought to dictate it. WIS. STAT. RULE § 809.25(3)(c)2. The Larsons have attempted to argue, without any legal basis, that: Bieniek did not have the authority to issue summer homework because WIS. STAT. § 118.001, 120.12(14), and 120.13 do not apply to him; that 118.001, 120.13 are unconstitutionally overbroad and that 120.12(14) is unconstitutionally vague; and that summer homework violates parents' right to direct the education and upbringing of their children. As the previous sections demonstrate, it is obvious that the Larsons have failed to comprehend the legal principles that they discussed and attempted to apply. The Larsons' briefs frequently fail to cite any authority, or cite irrelevant authority and misconstrue the authority cited. This is not a "reasonable investigation of the facts and the law." *See Holz*, 223 Wis. 2d at 608. While the Larsons may consider their arguments to have been made in good faith, no reasonable attorney would have made them. *See id.* Mindful of the fact that some leniency may be allowed, the fact remains that "neither a trial court nor a reviewing court has a duty to walk *pro se* litigants through the procedural requirements or to point them

to the proper substantive law." *Waushara County v. Graf,* 166 Wis. 2d 442, 452, 480 N.W.2d 16 (1992). The Larsons have utterly failed to present an arguable legal basis showing why their case should not have been dismissed. What is more, despite the trial court's explicit declaration that their claims against Burmaster —which were the same as those brought against the District at the trial court level—were frivolous, and the trial court's advice against attempting a *pro se* appeal, the Larsons chose to ignore these warnings.

¶ 48. Recognizing that all doubts about whether an appeal is frivolous must be resolved in favor of the appellant, *see Rabideau v. City of Racine,* 2001 WI 57, ¶ 46, 243 Wis. 2d 486, 627 N.W.2d 795, we conclude that the Larsons' entire appeal is frivolous, *see Howell,* 282 Wis. 2d 130, ¶ 9. We therefore remand the matter to the trial court to conduct a hearing to assess reasonable costs and attorney fees incurred by the District in responding to the Larsons' appeal.

*By the Court.*—Order affirmed; cause remanded with directions.